## Fyffe v. Commonwealth.

(Decided Nov. 2, 1934.)

C. F. SEE, Jr., JOHN W. WHEELER, M. O. WHEELER and J. L. HARRINGTON for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

Upon his separate trial had February 21, 1934, under an indictment charging him, Henry Fyffe, and James Fyffe with the murder of Alma Fyffe, John Fyffe

was convicted of manslaughter and his punishment fixed at five years in the penitentiary.

A map was used on the trial and as a result this is a fair sample of the record:

"They was back in the shop—I can show you—Like—say this is the shop door [indicating]—The grindstone sits in this side [indicating]—Noah was leaned up against the grindrock frame—I was here [indicating]—He leaning over him—three or four feet here [indicating] He was standing here—me and Noah was standing here [indicating]."

This is as meaningless as that much Sanskrit. We had hoped that what we have said in other cases might induce attorneys to avoid leaving records in this condition where they are likely to reach this court. See Luttrell v. Com., 250 Ky. 334, 63 S. W. (2d) 292; Lewis v. Com., 224 Ky. 502, 6 S. W. (2d) 502; Royal Collieries Co. v. Wells, 210 Ky. 600, 276 S. W. 515; General Refractories Co. v. Morrison, 212 Ky. 411, 279 S. W. 651; Conley v. Com., 208 Ky. 538, 271 S. W. 566; Wolfinbarger v. Stanton, 220 Ky. 451, 295 S. W. 467; Blanks v. Com., 223 Ky. 484, 3 S. W. (2d) 1105.

This homicide occurred about noon April 26, 1932, in a blacksmith shop belonging to Wm. Mullins and situated on Keaton's fork of Blaine creek in Johnson county.

To prepare a clear account of this homicide is made quite difficult by reason of the use of this map.

The father and mother of the defendant had reared a large family, six boys and several girls. As a result of the discovery of oil on his property the old man was quite wealthy. His son Noah was quite envious of his brother Alma, his youngest brother, and suspected him of trying to arrange to get an advantage over the others in the old man's property and he had made many ugly threats about what he would do to Alma.

Noah Fyffe was a deputy sheriff and went about armed with a .45-caliber Luger pistol.

On Sunday, April 24, 1932, he arrested his brother Alma Fyffe, for being drunk, so he said, and in making the arrest he beat him over the head with this Luger pistol and produced some severe scalp wounds thereby.

The old people heard of this and sent for John Fyffe and Henry Fyffe to go and hunt up Alma. On Tuesday, the 26th, John and Henry found Alma and he went with them to this settlement on Keaton's fork; their purpose being so they testify, to arrange to get a truck and move Alma and his family to another neighborhood and away from where Noah Fyffe lived.

As these three brothers came into this settlement they stopped at a store and were told by another brother, Parley Fyffe, that he had seen Noah Fyffe over at the blacksmith shop, and John said he wanted to talk to Noah and started over to the shop.

When these three men passed this shop on their way to the store, Noah Fyffe remarked to Wm. Mullins, Jess Mullins, and Liss Gillem, who were in the shop: "There come the boys, they have come for trouble. I deputize you three men to help me make any arrests I have to make today. If you want any guns and have not got them, go get them." Jess Mullins left, got a pistol, and returned. Soon John came in the shop and talked pleasantly with Noah and the party for a while principally about the rainy weather that was then prevailing, then Henry Fyffe came, and after saying a few words to the party generally asked Noah why he had hit Alma. Noah's temper was rising and he replied: "It is none of your God-damned business." In a moment Alma came in, and going up to Noah removed his hat, exposed his wounds, and said, "Noah, look what you done, son," or "Look what you did to me Sunday." Thereupon Noah, who was now in a rage, drew his Luger and remarked: "I'll shoot your God-damned brains out."

At this point there is conflict in the evidence. Liss Gillem and Jess Mullins, who testify for the commonwealth, say that John Fyffe drew his pistol, a .32-20, and began shooting Noah Fyffe, and when he fell then shot Alma Fyffe, and that John did all the shooting that was done. Noah and Alma were both instantly killed. John Fyffe and Henry Fyffe say Noah fired the first shot, that John grabbed at Noah and the first shot went into the ground, and that it was a second shot fired by Noah that killed Alma. That about the time of the second shot John began shooting at Noah and continued until Noah fell, and they say John did not shoot Alma. John

says he shot and killed Noah in an effort to save the life of Alma.

Jess Mullins testified: *"Well, he had his pistol shooting at Noah—Alma and them was tangled up—the best I could get it, it was toward either one of them— subject to hit either one of them." "He was shooting in amongst him."*

A ball was extracted from the body of Alma Fyffe and there is sharp conflict in the evidence as to whether it was fired from a .32-20 shell or a .32 short. The ball in question gave indication of having struck some hard substance, which had shaved off a portion of it and left the remainder in a wedge shape.

This and some other balls were weighed with these results:

The ball in question, 83 grains.

Ball picked up in shop fired from a .32-20, 96 grains.

Ball removed from a .32-20, 100 grains.

Ball removed from a .32 short, 87 grains.

Ball removed from a .45, 255½ grains.

The Instructions.

There is a sharp criticism of the first instruction, in support of which the case of Strange v. Com., 254 Ky. 57, 70 S. W. (2d) 972, is cited; but there is no merit in this contention. We have in the recent cases of Shelton v. Com., 255 Ky. 745, 75 S. W. (2d) 494, and Richmond v. Com., 255 Ky. 758, 75 S. W. (2d) 500, disposed of this question adversely to the appellant's contention.

Instruction 2 was a definition of the word "willfully," No. 3 was a reasonable doubt instruction, and no other instruction was given.

In view of the fact that the bullet removed from the body of Alma Fyffe indicated it had struck some hard substance and glanced, and in view of the italicized portion of the testimony of Jess Mullins, this jury might have concluded, if given a chance to do so, that Alma Fyffe was killed by a ball fired intentionally by John Fyffe at Noah Fyffe, but which unintentionally struck and entered the body of Alma Fyffe directly, or which struck some hard substance in the shop and glanced or

rebounded therefrom and entered the body of Alma Fyffe.

We have called attention to some of the evidence from which a jury might infer Alma Fyffe had been unintentionally shot by John Fyffe while shooting at Noah Fyffe, and that brings us to the question of the right of John to shoot Noah. When he was testifying about Alma exhibiting his sore head to Noah, he said: "Noah never said a thing only 'I will kill every God-damned one of you.'" This is from another part of his testimony:

"Q. Why did you shoot there at the time you did, John? A. He was trying to kill Alma and he said he would kill every God-damned one of us and I thought he would.

"Q. At the time you fired those shots did you believe Noah was going to kill any of you? A. Yes sir, I did."

This is from his cross-examination:

"Q. What was Noah Fyffe doing to you down there on that day that you shot him? A. He was, trying to kill Alma.

"Q. What was he doing to you? A. Well, he said he would kill every God-damned one of us." This is from his redirect examination:

"Q. John, you was asked on last night why you didn't grab Noah when he jerked his pistol— tell the jury why you didn't grab hold of him? A. Well, he was lots bigger and stronger than I was and I knowed I couldn't hold him.

"Q. Did he also at the same time have his pistol in his hand? A. Yes."

The culpability of John for killing Alma unintentionally while shooting at Noah depends upon the right of John to shoot at Noah when and as he did.

In addition to those given the court should have given an instruction defining John's right to shoot Noah in defense of himself or in defense of Alma, and telling the jury that, if in so shooting at Noah he unintentionally shot Alma, he was entitled to an acquittal.

### Questions by the Court.

Appellant objected to the court interrogating the witnesses. This is sometimes unavoidable, but it is not a practice to be encouraged for it is likely to lead the court into error, for it may indicate the views of the court upon the question of the guilt or innocence of the defendant or the court may in such interrogation ask some question or make some remark calculated to reflect upon defendant or his counsel and that occurred in this case. The court had asked Henry Fyffe a question, and defendant, by counsel, objected, whereupon the court said: "On what ground? Don't you want the Jury to know the whole truth—all the facts in the case?"

This remark was calculated to induce the jury to believe the defendant was endeavoring to conceal important facts, that the jury should know. The court will refrain from making such remarks upon the next trial.

### Other Alleged Errors.

Appellant is complaining of many other things that are not likely to recur, so we reserve our judgment concerning them, but will say that since the shooting of Alma while shooting at Noah must depend for excuse if any, upon the right of John then to shoot at Noah in defense of himself or Alma, and this in turn must depend upon the danger to himself or Alma which in the exercise of a reasonable judgment he then saw from what Noah was saying and doing, it follows that evidence of previous difficulties not too remote, between himself and Noah or between Alma and Noah, and Noah's threats against either, should have been admitted, not in detail of course, for the purpose of enabling the jury to determine the reasonableness of John's conclusion that either he or Alma was then in danger at the hands of Noah.

Judgment reversed.